## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROY HUNTER, on behalf of himself and others similarly situated, | Case No.: 1-21-cv-03075-FB-RER |
| Plaintiffs, | |
| -against- | **AMENDED COMPLAINT** |
| TOTAL LIFE CHANGES LLC, | |
| Defendant. | |

### COMPLAINT

Plaintiff, **ROY HUNTER**, individually and on behalf of the putative class ("Plaintiffs" or "Class Members"), complaining of the Defendant, **TOTAL LIFE CHANGES LLC**, by his attorneys, **RICHMAN LAW FIRM PLLC**, alleges, upon information and belief, that:

### PRELIMINARY STATEMENT

1.      Plaintiff, Roy Hunter, is an employee of the Metropolitan Transportation Authority ("MTA").  Formerly a bus operator, recently demoted to the title/role of bus cleaner, Plaintiff Hunter has had his compensation significantly reduced and suffered significant emotional distress as a result of the reckless, negligent, and potentially fraudulent behavior of Defendant Total Life Changes LLC ("TLC"), a company which, in this instance, chose to put 'profits over people'.

2.      More specifically, and fully explained herein, Plaintiff Hunter unknowingly ingested THC by drinking the IASO TEA INSTANT with Broad-Spectrum Hemp Extract THC tea product ("ITIBSH" or "subject tea product") which was developed, sold, and marketed as having 0.0% THC contained therein by the Defendant despite testing indicating otherwise.  Had

1

Plaintiff Hunter known that the product contained THC, he would have never purchased the subject tea product.

3.      As a result, Plaintiff Hunter's life, as well as the lives of countless others within the State of New York have been changed forever.  This lawsuit seeks compensatory, consequential, liquidated, statutory, and punitive damages for Plaintiff as against the Defendant together with all other appropriate relief provided by state, federal and common law as Defendant must be held accountable for such untoward and greedy conduct as Plaintiff sustained significant emotional distress, has been caused to lose compensation, and did not obtain the benefit of his bargain in purchasing a product that was clearly mislabeled and incorrectly advertised and/or marketed as a product containing 0.0% THC.

4.      Further, this lawsuit seeks compensatory, consequential, liquidated, statutory, and punitive damages for all others similarly situated to Plaintiff, that purchased the subject product as said other individuals similarly situated paid a premium for said product, which was consumer oriented, and were caused to sustain damages as a result of not obtaining the benefit of their bargain as the product was clearly mislabeled and incorrectly advertised and/or marketed as a product containing 0.0% THC.

## **THE PARTIES**

5.      At all times hereinafter mentioned, Plaintiff **ROY HUNTER** ("Hunter"), is a resident of the State of New York, County of Richmond.

6.      Upon information and belief, Defendant, **TOTAL LIFE CHANGES LLC** ("TLC"), is a foreign limited liability corporation organized and existing by virtue of the laws of the State of Michigan and is authorized to transact business in each and every State in the United States of America, including the State of New York, with its principal place of business located in

Fair Haven, Michigan.  Defendant, TLC engages in the sale of its products, more specifically, the ITIBSH tea product, in the State of New York and Plaintiff Hunter purchased said product while in the State of New York.

### STATEMENT OF FACTS AS TO PLAINTIFF ROY HUNTER

7.      Defendant TLC is a multi-level marketing company. TLC also manufactures the product at issue.

8.      TLC sells, distributes, markets, and advertises its products directly through its website, through third-party distributors such as Amazon.com, and through its representatives that it have called "life changers".  These life changers interact directly with consumers and also create promotional videos for the product that they place on online video streaming platforms such as YouTube.

9.      TLC sells ITIBSH, which was purported to contain 0.0% THC.

10.     Defendant also included a Certificate of Analysis on its website which indicated that there was no THC in the subject tea.  A copy of the relevant portion of a Certificate of Analysis (the first page) is below:

3



**TOTAL LIFE CHANGES, LLC**
**6094 CORPORATE DR**
**IRA, MI 48023**

# Certificate of Analysis

**ACS** | CANNABIS & HEMP
LABORATORY | BEYOND COMPLIANCE

Order #: TOT200910-040042    Order Date: 2020-09-10    Collection Date: 2020-09-14    Report Date: 2020-09-23

Batch #: 202396238    Initial Gross Weight: 149 g
Sample #: AAAP080    Net Weight: 4200 mg
Specimen Type: CBD/HEMP Derivative Products (Ingestion)    Method: SOP-3
Extracted From: Hemp
Description: Iaso Instant Tea Raspberry Lemonade Flavor

| Potency | Heavy Metals | Mycotoxins |
|---|---|---|
| Tested | Passed | Passed |

| Pesticides | Residual Solvents | Listeria Monocytogenes |
|---|---|---|
| Passed | Passed | Passed |

| Pathogenic |
|---|
| Passed |

*The photos on this report are of a sample collected by the lab and may vary from the final packaging.*

| Total CBD | | Total THC | | Total CBG | |
|---|---|---|---|---|---|
| 0.352% | 14.771mg | Not Detected | | Not Detected | |

| Total CBN | | Other Cannabinoids | | Total Cannabinoids | |
|---|---|---|---|---|---|
| Not Detected | | Not Detected | | 0.352% | 14.771mg |

**Potency - 11 (Tested)**                                                                 **(HPLC/LCMS)**

| Analyte | Result (mg/g) | (%) | LOQ (%) | Analyte | Result (mg/g) | (%) | LOQ (%) | Analyte | Result (mg/g) | (%) | LOQ (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CBC | <LOQ | | 0.001 | CBD | 3.517 | 0.352 | 0.001 | CBDA | <LOQ | | 0.001 |
| CBDV | <LOQ | | 0.001 | CBG | <LOQ | | 0.001 | CBGA | <LOQ | | 0.001 |
| CBN | <LOQ | | 0.001 | Delta-8 THC | <LOQ | | 0.001 | Delta-9 THC | <LOQ | | 0.001 |
| THCA-A | <LOQ | | 0.001 | THCV | <LOQ | | 0.001 | Total CBD | 3.517 | 0.352 | 0.001 |
| Total THC | <LOQ | | 0.001 | | | | | | | | |

*Total CBD = CBD + (CBD-A * 0.877), *Total THC = THCA-A * 0.877 + Delta 9 THC, *CBG Total = (CBGA * 0.877) + CBG, *CBN Total = (CBNA * 0.877) + CBN, *Other Cannabinoids Total = CBC + CBDV + THCV + THCV-A, *Total Detected Cannabinoids = CBD Total + CBG Total + CBN Total + THC Total + CBC + CBDV + THCV + THCV-A , *Total (mg) = Total (%) * 100 * Net Weight(mg)/g) (mg/g) = Milligram per Gram, , LOQ = Limit of Quantitation, , LOD = Limit of Detection

Xueli Gao                                    Lab Toxicologist
Ph.D., DABT

Aixia Sun                                    Principal Scientist
D.H.Sc., M.Sc., B.Sc., MT (AAB)

*This report shall not be reproduced, without written approval, from ACS Laboratory. The results of this report relate only to the material or product analyzed. Test results are confidential unless explicitly waived otherwise. Accredited by a third-party accrediting body as a competent testing laboratory pursuant to ISO/IEC 17025 of the International Organization for Standardization.*

721 Cortaro Drive    P: +1 (866) 762-8379    E: info@acslabcannabis.com    License No. 800025015
Sun City Center, FL - 33573    F: +1 (813) 634-4538    http://www.acslabcannabis.com    CLIA No. 10D1094068

1 of 5

11.     On or about November 5, 2012, Plaintiff was hired by the MTA to be a bus operator,

his dream job.  At or around such time, Plaintiff was notified that the MTA had a drug testing

policy.  Said policy was that employees in the role of bus operator (and potentially other roles) were required to submit to random drug testing, for, *inter alia*, THC.

12.    Employees of the MTA who fail random drug tests are submitted into a certain protocol, which, upon information and belief, is as follows:  A first failed drug test results in an MTA employee having to submit to a drug program.  A second failed drug test results in an MTA employee having to accept a permanent demotion to continue under the employ of the MTA and for said employee to have to submit to a drug program. If the employee does not accept the demotion, he is terminated.  A third failed drug test would cause the MTA employee to be terminated from his/her employment with the MTA.

13.    In or around June 2016, Plaintiff submitted to a random drug test and tested positive for THC.  This was Plaintiff's first failed drug test and he was then referred to a drug treatment program.  Plaintiff completed the drug treatment program and continued as a bus operator.

14.    During the period after June 2016, Plaintiff was subject to random drug tests by the MTA and the results were negative.  In or around 2020, Plaintiff submitted to a random drug test. The test resulted in a finding of sugar in Plaintiff's urine.  As Plaintiff had known that many bus operators gained weight and became unhealthy on the job due to the job being sedentary in nature, he knew that he needed to lose weight and get into better physical shape.  Plaintiff then made an appointment to see his primary doctor.

15.    At said appointment with his primary doctor, Plaintiff was given the devastating and shocking news that he was nearly diabetic.  Plaintiff then went on the internet and searched for healthy and safe ways to lose weight.  Plaintiff knew that losing weight would improve his health.

16.     Through Plaintiff's internet searches, he stumbled upon a website advertising the ITIBSH tea product as having 0.0% THC and that said tea would aid in weight loss.  Plaintiff thought that this might be able to help him lose weight and took notice, read, and relied on the packaging, which indicated that the product contained 0.0% THC.  Plaintiff knew that if he ingested THC, he could be subjected to further discipline from the MTA.  Plaintiff relied on the labeling and packaging on the IASO Tea product which induced him to purchase the subject tea product, believing that he would be "safe" if he consumed said product because it purportedly did not contain THC.

17.     On or about June 11, 2020, Plaintiff purchased the ITIBSH tea product for $59.95 off of the website and began ingesting/consuming said product regularly.  Plaintiff followed the specific instructions on the packaging when ingesting the subject tea product.

18.     Between June 2016 and July 10, 2020, and prior to the first failed test in June 2016, Plaintiff submitted to numerous random drug tests within the course of his employment.  Plaintiff tested negative on each of those tests.

19.     Plaintiff did not knowingly ingest or use THC after his first failed test in June 2016.

20.     On or about July 15, 2020, Plaintiff was asked to take a random drug test.  Plaintiff submitted to said drug test.  At the time of the drug test, Plaintiff was unaware of the consequences of unknowingly ingesting/consuming the ITIBSH tea product.

21.     After having submitted to the drug test, Plaintiff was asked by his dispatcher to go back to the drug testing clinic.  Plaintiff, thinking nothing was wrong, went right back to the drug testing clinic.

22.    Upon entering the facility, Plaintiff was escorted to a room and was informed therein that he failed his drug test.  Plaintiff was informed that he had tested positive for THC.  Plaintiff immediately stopped consuming the ITIBSH tea product.

23.    Plaintiff's life came crashing down around him.  Plaintiff began to feel numb, cold, light-headed, and as if he was going to faint.

24.    Plaintiff immediately responded, saying, in sum and substance, that the test was false and that there was no way that THC was found in his urine.  Plaintiff had not knowingly ingested THC and was not a user of THC at this time.  As such, Plaintiff was flabbergasted.

25.    Knowing what could result from the drug test, Plaintiff began to plead, beg, cry, and swear that this was a mistake and that there was no way that there was THC in his urine.  His pleas "fell on deaf ears."  Feeling defeated and devastated, Plaintiff went home.

26.    A few days later, Plaintiff was called into the depot and was offered a "plea deal."  Plaintiff was given two (2) unenviable choices: (1) accept a demotion to bus cleaner; or (2) be immediately terminated from his employment with the MTA.  During this period, Plaintiff was laid off from MTA because of the positive drug test.

27.    Plaintiff, still swearing that this was a mistake and knowing that he had not knowingly ingested THC, dropped to his knees, swore on his newborn son, that he did not and would never use drugs, especially knowing his likelihood of termination if he tested positive for drugs.

28.    After discussing this situation with his union representative, Plaintiff, who was exceptionally frustrated and depressed, begrudgingly accepted the demotion to bus cleaner.  As a term and condition of accepting this demotion, as he needed to earn a living, Plaintiff was required to enroll and complete a drug program and to be randomly drug tested twice (2x) a week for eight

(8) months.  Plaintiff took approximately sixty-four (64) drug tests, and all sixty-four (64) drug

tests returned a negative result.  Plaintiff began the Tri Center Drug Program on July 23, 2020 and

approximately eight (8) months later, he was recommended to begin work as a bus cleaner.  Due

to the COVID-19 pandemic, his return to work was delayed even further.  In or around April 2021,

Plaintiff began work as a bus cleaner.

29.     Plaintiff was anxious and eager to figure out how he could have tested positive for

THC without having ingested THC.  Plaintiff believed that the test was a false positive.

30.     Plaintiff then remembered that he had ingested the ITIBSH tea product and the

labeling on the package the marketing/advertising/promotional materials, all of which indicated

that the ITIBSH tea product contained 0.0% THC.

31.     A picture of the packaging of the ITIBSH tea product is below:





31.     The front of the packaging, in pertinent part, clearly read as follows:

IASO TEA INSTANT WITH BROAD-SPECTRUM HEMP EXTRACT 0.0% THC

32.     The back of the packaging, in pertinent part, clearly reads as follows:

This proprietary formula is powered by 100mg of organic Broad-Spectrum Hemp Extract with 0% laboratory certified THC content [...].

Total Life Changes, LLC Iaso Instant Tea utilizes a Broad-Spectrum Hemp Extract which contains 0.0% total THC as evidenced through independent laboratory tests.

33.     Plaintiff had relied on the representation on the front and back of the packaging of the ITIBSH Tea Product when purchasing the product, i.e., that the product contained 0.0% THC, that the product's hemp extract contained 0% laboratory certified THC content, and that the hemp extract contained in the tea which contains 0.0% total THC was evidenced through independent

laboratory tests. Plaintiff paid a premium for the tea because it represented it was THC free, i.e., 0.0%.

34.     On or about March 18, 2021, Plaintiff took a few of the individual tea packets from the same larger package of tea and mailed it for laboratory testing to the Anresco Laboratories ("Anresco") in San Francisco, California.  Anresco conducted testing on said samples of tea to determine whether or not the samples contained THC.

35.     Soon thereafter, Plaintiff received the results, which indicated that the samples of the tea from the package contained THC.

36.     A copy of the pertinent portion of the test results are below:

### ANALYTICAL RESULTS

| Analysis | Cannabinoid Profile |
| Instrument | Liquid Chromatography Diode Array Detector (LC-DAD) |
| Method | MF12D012 |
| Analysis Date | March 18, 2021 to March 22, 2021 |

| Cannabinoid | mg/g | % | mg/serving |
| --- | --- | --- | --- |
| $\Delta$8-THC | 0.22 | 0.022 | 1.05 |
| $\Delta$9-THC | 0.86 | 0.086 | 4.10 |

37.     Despite the exterior packaging of the subject tea specifically indicating that the product inside contains 0.0% THC, this is an absolute fallacy as the above test indicated that the subject tea contains THC.

38.     Plaintiff has sustained and continues to sustain significant monetary and compensatory damages, including emotional distress damages as a direct and proximate result of drinking the subject tea and having purchased a product that contained materially false and misleading misrepresentations as to the percentage of THC in the subject product.  Further, on or about April 16, 2021, Plaintiff notified Defendant TLC by mailing a notice of said defect to the headquarters of TLC and TLC's counsel.

39.     Plaintiff was out of work for approximately nine (9) months before starting as a cleaner, a job that pays less than a bus driver, has less benefits, no overtime opportunities and is more physically taxing and is considered a much lower grade job than bus driver among his peers.The demotion has caused Plaintiff to sustain severe emotional distress, which manifests itself with physical and mental symptoms including, *inter alia*, anxiety, panic attacks, sleep disturbances.

## STATEMENT OF FACTS COMMON TO ALL PLAINTIFFS

40.     Plaintiffs are purchasers of the ITIBSH tea product.

41.     Plaintiffs purchased the ITIBSH tea product at a premium price as the ITIBSH product was marketed as a healthful tea product which improves mood, weight loss, weight management, boosts energy, mental clarity, improved skin, cleanses your intestines and internal organs, suppresses appetite, improves blood flow, helps reduce inflammation, promotes regularity and a healthy digestive tract, among other health benefits.

42.     Plaintiffs purchased the ITIBSH tea product for at least $50.00, most purchasers paying as much as, if not more than, $59.95.  The purchase of a tea product for greater than $50.00 is a premium price to pay for a tea product.  The product was and is consumer oriented.

43.     The subject tea product was advertised and/or marketed as having 0.0% THC.

44.     Defendant's representation that the subject tea product contained 0.0% THC was to induce consumers, such as Plaintiffs, to purchase the subject tea product.

45.     The subject tea product contained greater than 0.0% THC.

46.     The Plaintiffs did not receive the benefit of their bargain in purchasing the subject tea product as the subject tea product contained greater than 0.0% THC despite the packaging as referenced above indicating that the subject tea product contains 0.0% THC.

47.    Plaintiffs were deceived by Defendant's deceptive trade practices and false advertising of marketing and advertising the subject tea product of having 0.0% THC.

48.    As such, Plaintiffs are entitled to compensation, by way of, in the least, a partial refund, as they were victims of false advertising/marketing which caused them harm.

## JURISDICTION AND VENUE

49.    Jurisdiction has been established by Defendants having timely filed a Notice of Removal on May 28, 2021, indicating therein that the basis of said removal is that there is diversity of citizenship among the parties in this action and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

50.    Further, this Court also has jurisdiction over each and every claim asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), since members of the putative class reside in states across the Country, including, but not limited to, New York; Defendants are entities incorporated within the States of Michigan; there are more than 100 putative Class Members; and the amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.

51.    Also, this Court has personal jurisdiction over Defendants because the Defendants purposefully availed themselves of the State of New York by placing its products, namely, the subject tea, in the stream of commerce and by marketing and selling all of its products in the State of New York and/or by having such contacts with New York as to render the Court's exercising of jurisdiction over the Defendants consistent with the traditional notions of fair play and substantial justice. Named Plaintiff purchased the subject tea while in New York.

52.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because the Plaintiff and putative Class Members reside in the geographic location within the Eastern District of New York, the defendants operate and advertise their business in the geographic location within Eastern District

of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

**CLASS ACTION ALLEGATIONS**

53.     Plaintiff has commenced this action, in part, as a class action on behalf of all individuals who have purchased the subject tea while in the State of New York.

54.     **Ascertainable class**:   The proposed Class is ascertainable in that its members can be identified and located using information contained in Defendants' records kept in the ordinary course of their business, specifically customer information such as invoices, receipts, and any and all databases which contain personally identifiable customer information which includes names, addresses, and telephone numbers.  The members can also be identified by the records of customer information kept in the ordinary course of business of the Defendants' representatives, distributors, and third parties who sold subject tea.

55.     **Numerosity**:   The potential number of persons in the Class is so numerous that joinder of all members would be unfeasible and impractical. The disposition of their claims through this class action will benefit both the parties and this Court. The number of persons in this Class is unknown to Plaintiffs at this time; however, it is estimated that the number far exceeds one hundred (100) individuals.

56.     **Typicality**:   Plaintiffs' claims are typical of the claims of all of the other members of the Class because all of their claims arise from the same and/or event, practice, course of conduct by Defendant, namely the product defect in the subject tea and the mislabeling and misrepresentations made by Defendants to market and sell of the subject tea to the Class.

57.     **Adequacy**:   Plaintiff Hunter is an adequate representative of the Class; will fairly protect the interests of the other members of the Class; has no interest(s) antagonistic to the

members of the Class; and will vigorously pursue this suit through his attorneys who are competent, skilled, and experienced in litigating matters of this type. There will be no difficulty in the management of this action as a class action.

58. **Superiority**:   The nature of this action makes the use of the class action vehicle a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the other members of the Class for the wrongs alleged herein, as follows:

   a. This case involves a large corporate Defendant and potentially other large corporate entities and Plaintiffs are a significant number of individuals with many relatively small claims and common issues of law and fact;

   b. If each individual member of the Class was required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage because, with its vastly superior financial and legal resources, it would be able to exploit and overwhelm the limited resources of each individual member of the Class;

   c. Requiring each individual member of the Class to pursue an individual remedy would also discourage the assertion of lawful claims by members of the Class who would be disinclined to pursue an action against Defendants due in part to cost of having to file said action and retain competent counsel;

   d. The Prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual members of the Class against Defendants; would establish potentially incompatible standards of conduct for Defendants, would result in legal determinations with respect to individual members of the Class which would, as a practical matter, be dispositive of the interest of the other members of the Class who are not parties to the adjudications; and/or would substantially impair or impede the ability of the members of the Class to protect their own interests;

   e. The claims of the individual members of the Class may not be sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses thereto;

   f. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or even impossible for individual member of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action; and

14

g.  The costs to the court system of adjudication of such individualized litigation would be substantial.

59.  **Existence of Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to members of the Class which predominate over questions affecting only individual members of the Class, including, but not limited to, the following:

**Common Questions of Fact and Law regarding Defendant's False Advertising, Mislabeling, and General Conduct Under the Attendant Circumstances**

a.  Whether TLC knew or should have known that the subject tea product contained more than 0.0% THC;

b.  Whether TLC's labels, marketing, and advertising claims that the subject tea product contained 0.0% THC was consumer-oriented;

c.  Whether TLC's statement that the product contained 0.0% THC was a material misrepresentation;

d.  Whether TLC's statement on its subject tea packaging is deceptive in that the product therein contains 0.0% THC when in fact, it does contain greater than 0.0% THC;

e.  Whether TLC's statement on its subject tea packaging is false and/or misleading (intentional or otherwise) to the general public and/or consumers of said product in stating that the product therein was tested by a facility which indicated that the product contains 0.0% THC when in fact, it does contain greater than 0.0% THC;

f.  Whether TLC's statement on its subject tea packaging constituted an expressed or implied warranty that the product contained 0.0% THC;

g.  Whether TLC's conduct constituted a violation of their expressed or implied warranty;

h.  Whether TLC's conduct violated consumer protection statutes and the common law protecting consumers against fraud and negligent, or intentional misrepresentations;

i.  Whether TLC's omission on its subject tea packaging is false and/or misleading (intentional or otherwise) to the general public and/or consumers of said product in omitting the fact that the product contained greater than 0.0% THC;

j.   Whether TLC should retain the money paid by Plaintiffs for their product;

k.   Whether Plaintiff and Class Members are entitled to damages compensatory, incidental, consequential, and punitive damages, together with costs, fees, and attorneys' fees;

l.   Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct;

m.  What equitable relief is appropriate to redress Defendant's wrongful conduct;

n.   What injunctive relief is appropriate to redress the imminent and currently ongoing harm faced by members of the Class.

**Additional Questions of Fact and Law regarding TLC's Conduct:**

a.   Whether Defendant is liable for attorneys' fees and costs associated with this litigation.

60.   Plaintiffs intend to send notice to all members of the Class to the extent required by applicable law.

**AS AND FOR A FIRST CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF AND THE CLASS MEMBERS**
**Breach of Express Warranty**

61.   Plaintiffs repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

62.   Defendant marketed, sold, and/or distributed IASO TEA INSTANT with Broad-Spectrum Hemp Extract 0.0% THC tea product and Plaintiff purchased the ITIBSH tea product.

63.   Defendant represented in its marketing, advertising, and promotion of the ITIBSH tea product that its product contained 0.0% THC.  Defendant made these representations to induce Plaintiff, among others, to purchase the ITIBSH tea product.  These representations did in fact induce Plaintiff to purchase this product.

64.     In further support its promise that the product contained 0.0% THC, the Defendant stated on the back of the packaging of said product that its product was tested in an independent laboratory and found to have 0.0% THC.

65.     Class Members and consumers, including Plaintiff, based their purchasing decision on the affirmations that the Defendant made about the ingredients contained in the product especially considering that the Plaintiffs sought certain benefits from ingesting the "detox" tea which they otherwise would not be seeking in his purchase of other consumer goods.

66.     Accordingly, Defendant's representations that the ITIBSH tea product contained 0.0% THC became part of the basis of the bargain between Defendant and Plaintiffs.

67.     The ITIBSH tea products did not conform to the Defendant's promise or description regarding "0.0% THC" because at all relevant times the ITIBSH tea product contained greater than 0.0% THC.

68.     As a direct and proximate result of Defendant's breaches of its express warranties and its failure to conform to the ITIBSH tea product's express representations, Plaintiffs have been damaged.  Plaintiffs have suffered damages in that they did not receive the product that they specifically paid for and that Defendant warranted that it would be.  In addition, Plaintiffs paid a premium for this ITI BSH tea product of at least $50.00, most purchasers paying as much as, if not more than, $59.95, i.e., Roy Hunter's purchase price. The purchase of a tea product for greater than $50.00 is a premium price to pay for a tea product.  Plaintiffs also unwittingly ingested THC as a result of the Defendant's misrepresentation.

69.     Accordingly, Plaintiffs are entitled to compensatory, incidental, and consequential damages that resulted from the Defendant's breaches of its express warranties.  Plaintiffs are also entitled to attorneys' fees and costs associated with the pursuit of this action.  Plaintiffs demand

judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

## AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF PLAINTIFF
### Breach of Implied Warranty of Merchantability

70.     Plaintiffs repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

71.     Defendant marketed, sold, promoted, and/or distributed the ITIBSH tea product, and Plaintiff purchased the ITIBSH tea product.

72.     Plaintiffs bring this claim for breach of the Uniform Commercial Code and New York State law implied warranty of merchantability.

73.     The Defendant is a merchant as defined by applicable UCC provisions.

74.     The Defendant has breached the implied warranties of merchantability that it made to Plaintiffs.  For example, Defendant impliedly warranted that the ITIBSH tea product was free from defects, that it was merchantable, that it was fit for the ordinary purpose for which these kinds of tea products are used, and that the ITIBSH tea product conformed with the affirmations made on the label.

75.     When sold by Defendant, the ITIBSH tea product was not merchantable, did not conform with the promises and affirmations made on the label, was not a 0.0% THC product as it contains greater than 0.0% THC, was not of adequate quality within that description, was not fit for the ordinary purposed for which such goods are used, and did not conform to the promises or affirmations of fact made on the container, packaging, or label.

76.     As a direct result of the ITIBSH tea product being unfit for its intended purpose as a 0.0% THC product and/or otherwise not merchantable, Plaintiffs have been damaged and is entitled to remedies, including, but not limited to, monetary compensation.

18

77.     Because of the defects in the ITIBSH tea product as described herein, the value of the ITIBSH tea product as warranted is greater than the actual value of the ITIBSH tea product.

78.     Plaintiff Hunter would not have purchased the ITIBSH tea product had he known that the ITIBSH tea product contained THC as he knew that had he ingested THC, he would have tested positive for THC during one of the routine MTA drug tests and be subjected to termination from his dream job as a bus operator.

79.     Plaintiff, and others in the class, would not have purchased the ITIBSH tea product, or would have paid less for the product, had they known the ITIBSH tea product contained THC.

80.     Plaintiffs purchased and paid a premium price for this tea based on Defendant's misrepresentations.  Damages, which may be measured pursuant to the damages provisions of Article 2 of the UCC, are warranted to Plaintiff.

81.     As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff is entitled to compensatory, incidental, and consequential damages. Plaintiff is also entitled to attorneys' fees and costs associated with the pursuit of this action. Plaintiff demands judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

### AS AND FOR A THIRD CAUSE OF ACTION ON BEHALF OF PLAINTIFF
### Breach of Implied Warranty of Fitness for a Particular Purpose

82.     Plaintiffs repeats and realleges each and every one of the allegations set forth *supra* as if fully set forth herein.

83.     Defendant marketed, sold, and/or distributed the ITIBSH tea product, and Plaintiffs purchased the ITIBSH tea product.

84.     Plaintiffs bring this claim for breach of the Uniform Commercial Code and various state laws' implied warranty of fitness for particular purpose who purchased the ITIBSH tea product as a non-THC tea product.

85.     The Defendant are merchants as defined by applicable UCC provisions.

86.     The Defendant have breached the implied warranties of fitness for particular purpose that it made to Plaintiffs.  Defendant, through its own marketing and website, through its distributors, and through its representatives, offered the ITIBSH tea product as a detox tea.

87.     When sold by Defendant, the ITIBSH tea product was not fit for this particular purpose because it was advertised as but was not a "detox tea" and that it contained 0.0% THC when in fact it contained THC, which is an intoxicant, and in some jurisdictions, illegal.

88.     As a direct result of the ITIBSH tea product being unfit for its intended purpose as a 0.0% THC product, Plaintiffs were damaged and are entitled to remedies.

89.     The value of the ITIBSH tea product as warranted by Defendant is greater than the actual value of the ITIBSH tea product.  Plaintiffs would not have purchased the ITIBSH tea product on the same terms, or purchased the ITIBSH Tea at all, had it known that the ITIBSH tea product in fact contained THC.  Plaintiffs paid a premium price for this tea based on Defendant's misrepresentations.  Plaintiffs are entitled to damages, which may be measured pursuant to the damages provisions of Article 2 of the UCC.

90.     As a direct and proximate result of Defendant's breach of the warranties of fitness for a particular purpose, Plaintiffs have been damaged in an amount to be proven at trial.  Plaintiff is entitled to compensatory, incidental, and consequential damages, and attorneys' fees and costs associated with the pursuit of this action.  Plaintiffs demand judgment against Defendant in an

amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF AND THE CLASS MEMBERS**
**<u>Unjust Enrichment</u>**

91.     Plaintiffs repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

92.     Plaintiffs conferred benefits on Defendant by purchasing the ITIBSH tea product at a premium price.

93.     Defendant had knowledge of its receipt of such benefits.

94.     Defendant have been unjustly enriched in retaining revenues derived from Plaintiff's purchases of the ITIBSH tea product.

95.     Defendant's retaining these moneys under these circumstances is unjust and inequitable because Defendant falsely and misleadingly represented that the ITIBSH tea product contains 0.0% THC when, in fact, the ITIBSH tea product contains greater than 0.0% THC.

96.     Defendant's misrepresentations have injured Plaintiff because he would not have purchased the ITIBSH tea product had he known the true facts regarding the ITIBSH tea product's ingredients in that it contains greater than 0.0% THC.

97.     Because it is unjust and inequitable for Defendant to retain such non-gratuitous benefits conferred on them by Plaintiffs, Defendant must pay restitution to Plaintiffs, as ordered by the Court and Plaintiffs are entitled to compensatory, incidental, and consequential damages, and attorneys' fees and costs associated with the pursuit of this action.  Plaintiffs demand judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

## AS AND FOR A FIFTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF AND THE CLASS MEMBERS
### Deceptive Trade Practices—General Business Law ("GBL") Section 349 *et seq.*

98.     Plaintiff and Class Members repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

99.     The ITIBSH tea product is a merchandise and/or product regulated by consumer protection acts and laws against deceptive trade practices, specifically New York General Business Law Section 349.  Defendant's marketing practices and misrepresentations as alleged is consumer oriented conduct within the meaning of GBL Section 349.

100.     Under New York GBL § 349, Defendant is prohibited from using any deceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service in the State of New York.

101.     As a company that sells its ITIBSH tea product online to residents in the State of New York and has sale representatives in the State of New York who sell products to New York residents, Defendant conducts business, trade or commerce in the State of New York.

102.     In the conduct of their business, trade, or commerce in New York State, Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in violation of N.Y. Gen. Busi. Law § 349, including but not limited to the following:

a. Defendant misrepresented and falsely marketed, advertised, and/or promoted material facts pertinent to the sale and use of the ITIBSH tea product to Plaintiff and others in the class by marketing, advertising, and/or promoting its product as containing 0.0% THC, when in fact the product contained greater than 0.0% THC.

b. Defendant omitted, suppressed, and/or concealed the material fact that the product contained greater than 0.0% THC.

22

103.    Defendant intended for reasonable consumers such as the Plaintiff and Class Members to see, hear and/or rely on this deceptive trade practice before deciding to purchase the product, and they were deceived by the Defendant's misleading labels and marketing materials.

104.    Plaintiff and other Class Members reasonably relied on the materially misleading labels and marketing materials in making the decision to purchase the subject tea product.

105.    Defendant directly and proximately caused Plaintiff to suffer an ascertainable loss in the form of monies spent to purchase deceptively labeled merchandise.  Plaintiff also suffered harm in the loss of his job as a MTA bus driver, a period of unemployment, loss of benefits and emotional distress as a result of Defendant's misleading consumer orientated conduct described herin.

106.    Defendant knew or should have known that the subject tea product contained greater than 0.0% THC, and that reasonable consumers like Plaintiff and other Class Members, would have relied on their misrepresentation in purchasing the product.  Defendant's act in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the Class Members.

107.    As such, Plaintiff and other Class Members are entitled to recover compensatory, incidental, consequential, and punitive damages, and attorneys' fees and costs associated with the pursuit of this action.  Plaintiff and other Class Members demand judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

### AS AND FOR AN SIXTH CAUSE OF ACTION ON BEHALF OF PLAINTIFF
### Negligent Misrepresentation

108.    Plaintiffs repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

109.    Defendant made a false statement about the concentration of THC in the ITIBSH tea product by stating that the ITIBSH tea product contained 0.0% THC when in fact the product had a concentration of THC that was greater than 0.0% THC.

110.    Defendant also made a false statement by representing that independent laboratory tests had confirmed that the ITIBSH tea product had 0.0% THC.

111.    Defendant were negligent in its misrepresentations.  The ITIBSH tea product had a higher concentration of THC than 0.0% as shown by the testing performed by Anresco Laboratories in California.

112.    Plaintiffs relied on the Defendant's representations in purchasing the ITIBSH tea product.

113.    Defendant's negligent misrepresentations proximately caused Plaintiff to suffer an ascertainable loss in the form of monies spent to purchase the ITIBSH tea product.

114.    As such, Plaintiffs are entitled to recover restitution, as ordered by the Court and to the extent applicable, Plaintiffs are entitled to compensatory, incidental, and consequential damages, and attorneys' fees and costs associated with the pursuit of this action.  Plaintiffs demand judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

### AS AND FOR AN SEVENTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF AND THE CLASS MEMBERS
### False Advertising - Violation of GBL §§ 349, 350, *et seq.*

115.    Plaintiff, and Class Members, repeat and reallege each and every one of the allegations set forth *supra* as if fully set forth herein.

116.    Under New York GBL § 350, it is unlawful for the Defendant to use false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

117.    As a company that sells its ITIBSH tea product online to residents in the State of New York and has sale representatives in the State of New York who sell products to its residents, Defendant conducts business, trade or commerce in the State of New York.

118.    Plaintiff and other Class Members are residents of the State of New York, or purchased the product while in New York.

119.    Defendant's labeling, marketing materials, and advertisements to Plaintiff were consumer oriented.  Defendant's false advertising was made available to a wide audience on the internet through its website.  Consumers who spoke with TLC sale representatives, or who watched or heard promotional videos on video streaming platforms created by TLC's representatives were also told of the materially misleading information.

120.    The Defendant's false advertising induced Plaintiff and other Class Members to purchase the ITIBSH tea product and/or to purchase it at a premium price.

121.    Defendant's labels, advertisement, and marketing materials were materially misleading in that said marketing materials and advertisements indicated that the tea contained 0.0% THC, when, Defendant knew or should have known that in fact the ITIBSH tea product contained greater than 0.0% THC.

122.    The truth, i.e., that the subject tea product contains greater than 0.0% THC, was not displayed and/or conveyed on any of Defendant's marketing and/or advertising materials of and/or regarding the subject tea.

123.    An example of said labeling, marketing materials and/or advertisements is

contained in paragraphs 9, 31, and 32.

124.    Plaintiff and other Class Members were reasonable consumers who were misled by the Defendant's false advertising.  Plaintiff and other Class Members purchased the product after reading, seeing, hearing and/or relying on the Defendant's material misrepresentation that there was 0.0% THC in the ITIBSH tea product.

125.    Under New York General Business Law § 350, Defendant's marketing and/or false advertising activities to induce individuals to purchase and/or consume the subject tea product constitutes false advertising.

126.    Plaintiff, and other reasonable consumer-Class Members, suffered actual pecuniary loses as a result of Defendant's deceptive marketing materials and advertising as they were induced to purchase the subject tea product as they believed, based upon the subject marketing materials and advertising that the subject tea contained 0.0% THC.  Plaintiff and other Class Members would not have purchased the product or would not have paid a premium price for the product but for the Defendant's false advertising.

127.    Plaintiff, and other similarly situated Class Members, relied upon this representation as they knew that they were subjected to drug testing through their employer and that if tested positive, could lead to negative employment consequences, such as termination or demotion.

128.    Plaintiff, and others in the class, are entitled to recover damages as a result of Defendant's false advertising/marketing.

129.    As such, Plaintiff and other Class Members are entitled to recover restitution, as ordered by the Court and to the extent applicable, Plaintiff and Class Members are entitled to compensatory, incidental, consequential, and punitive damages, and attorneys' fees and costs

associated with the pursuit of this action.  Plaintiff and other Class Members demand judgment against Defendant in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

## JURY DEMAND

130.   Plaintiffs hereby demands a trial by jury of all claims alleged herein.

## REQUEST AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Roy Hunter demands judgment against Defendant in an amount to be determined at trial, inclusive of compensatory, incidental, consequential, and punitive damages, together with costs, fees, and attorneys' fees associated with the pursuit of this action. Further, Plaintiff Roy Hunter, on behalf of the proposed class, requests the following relief as against the Defendants:

a.   Notice to the Class of the action;

b.   Certify this case as a class action;

c.   Award of damages inclusive of compensatory, consequential, liquidated, and punitive damages commensurate with the applicable law;

d.   Reasonable attorneys' fees, costs, and expenses of this action;

e.   Pre-judgment and post-judgment interested as provided by law; and

f.   Such other, further, and different relief that the Court may deem just and proper.

**RESPECTFULLY SUBMITTED AND DATED** this 19th day of November 2021.

**RICHMAN LAW FIRM PLLC**

**/s/ *Scott B. Richman***
Scott B. Richman, Esq.

27

*Attorneys for Plaintiff and the Proposed Class*
630 Third Avenue, 23rd Floor
New York, New York 10017
Telephone: (646) 854-3547
Fascimile: (646) 693-6578
Email: srichman@richman-law-firm.com

**COBURN & GREENBAUM, PLLC**


***/s/ Jonathan Greenbaum***
Jonathan Greenbaum, Esq.
*Attorneys for Plaintiff and the Proposed Class*
COBURN & GREENBAUM, PLLC
1710 Rhode Island Avenue, NW
Washington, DC  20036
Telephone: (202) 470-1689
Facsimile: (866) 561-9712
Email: jg@coburngreenbaum.com
New York address:
99 Hudson Street, 5th Floor
New York, N.Y. 10013